IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL E. MEYER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-0342 |
| | ) | |
| v. | ) | Judge Gary Lancaster |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | Docket Nos. 8, 10 |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment (Docket No. 8) be denied at to his request for an award of disability insurance benefits and supplemental security income, but granted as to his alternate request for remand, that Defendant's Motion for Summary Judgment (Docket No. 10) be denied, and that the decision of the Commissioner of Social Security ("Commissioner") denying an award of disability insurance benefits and supplemental security income be vacated and remanded for further proceedings consistent with this report and recommendation.

II.     REPORT

Presently before the Court for disposition are cross motions for summary judgment.

A.      Procedural History

On March 15, 2005, Plaintiff, Carl E. Meyer, by his counsel, timely filed a complaint pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§

405(g) and 1383(c)(3), for review of the Commissioner's final determination disallowing his claims for disability insurance benefits (DIB) under Sections 216(i) and 223 of Title II of the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423, and for supplemental security income (SSI) under Section 1602 of the Social Security Act, as amended, 42 U.S.C. § 1381a.

On September 30, 2002, Plaintiff formally filed an application for disability insurance benefits and supplemental security income alleging that he became disabled on September 1, 2002 due to a congenital heart defect and a stroke.[1]  (R. 15.)  On March 25, 2003, the Social Security Administration (SSA) denied his claims for disability insurance benefits and supplemental security income finding that he was not disabled under the applicable rules.  (R. 36-39.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on the denial of both his DIB and SSI claims, which was ultimately held on December 9, 2003 before ALJ Janet G. Harner.  (R. 15, 302-49.)

On September 23, 2004, the ALJ denied Plaintiff's claim for DIB and SSI, concluding that although the evidence established that Plaintiff suffers from a congenital heart disease, a seizure disorder, and borderline intellectual functioning which, when considered in combination constitute a severe impairment, but not severe enough to meet or equal the requirements of any of the listed impairments set forth in Appendix 1, Subpart P, SSA  Regulations No. 4, he retained the "residual functional capacity to perform the exertional demands of light work which does not expose him to hazards and involves simple, routine and repetitive work not requiring reading or math skills or more than three steps that is in a low stress work environment (level 4 on a scale of 1-10) and does not involve strict production standards." (R. 17, 21.)  Consequently, the ALJ found Plaintiff has the

---

1.   Plaintiff protectively filed a claim for DIB and SSI on September 11, 2002.  (R. 15.)

residual functional capacity to perform his past work as a crew person at McDonald's, since this job falls within his functional capabilities.  (R. 17, 21.)  In the alternative, the ALJ found that Plaintiff has the residual functional capacity to perform other jobs which exist in significant numbers in the national economy, consistent with his medically determinable impairments, functional limitations, age, education, and work experience.  (R. 17, 21.)  Plaintiff filed a timely request for review of the ALJ's decision with the Appeals Council which was denied on January 27, 2005.  (R. 7-10.)  Plaintiff then filed the present action in this Court.

The issue before this Court is whether the decision of the Commissioner denying Plaintiff's claims for DIB and SSI is supported by substantial evidence.  (Pl.'s Brief in Supp. of Mot. for Summ. J. (hereinafter "Pl.'s Br.") at 2.)  In particular, Plaintiff complains on appeal that the ALJ's decision is not supported by substantial evidence and challenges it on the grounds that the ALJ: (1) failed to properly consider valid medical evidence of record in declining to accord appropriate weight to the medical assessments of Plaintiff's treating physicians, Doctors Smith and Jones; (2) completely ignored the Global Assessment of Functioning assessed by the consultative examining physician, Dr. Goral; and (3) failed to set forth adequate reasons for rejecting Plaintiff's testimony regarding his limitations.  Defendant argues, however, that the Commissioner's decision is supported by substantial evidence.

### B.    Statement of Facts

Plaintiff alleges that he became disabled on September 1, 2002 due to congenital heart defect and a stroke.  (R. 71.)  Neither Plaintiff nor the Commissioner disputes that Plaintiff suffers from physical and mental impairments which, in combination, are deemed severe.  (R. 16.)  The record clearly establishes that Plaintiff was born with a complex congenital heart defect known as D-

transposition of the great vessels, ventricular septal defect, and pulmonary stenosis.  (R. 121-127K, 131-196, 213-246, 288-89.)  At the age of six months, Plaintiff underwent cardiac surgery for correction of a transposition of his great vessels and insertion of a Porcine valve, during which he suffered a stroke, with destruction of approximately forty percent of his left cerebral hemisphere, which left him with significant cognitive dysfunction[2] as well as hemiparesis on his right side, more severe in the upper extremities.  (*Id.*)   Subsequently, Plaintiff underwent cardiac surgery on four other occasions in 1982,[3] 1984,[4] 1992[5] and 1998.[6]  In addition to these surgeries, Plaintiff underwent a cardiac catheterization and balloon valvuloplasty procedure for an obstructed conduit valve on two separate occasions–one in 1988 (R. 126, 133) and the other in May 1997 (R. 126-126A, 127G-127H, 133, 151).  Plaintiff was also hospitalized in January 1999 for an episode of subacute bacterial endocarditis and staphylocaccal septicemia following the August 1998 surgery for corrected transposition of the great vessels.  (R. 162-96.)  This condition was treated and resolved with antibiotics.  (*Id.*)

Plaintiff also suffers from a seizure disorder, which developed post-operatively after the 1998

2.  Plaintiff's verbal and performance I.Q. scores are 76, and his full scale I.Q. is 74, all of which fall in the borderline range of  intelligence.  (R. 256-57.)  The test scores revealed that he performs at a second grade level in reading, spelling and arithmetic.  (R. 257.)

3.  On November 18, 1982, Plaintiff underwent a right Blalock-Taussig shunt for transposition of the great vessels, ventricular septal defect, and pulmonary stenosis at the Mayo Clinic.  (R. 133, 133B, 152).

4.  On November 16, 1984, Plaintiff underwent Rastelli operation at the Mayo Clinic for complete transposition of the great vessels, ventricular septal defect, atrial septal defect, and pulmonary valvular and subvalvular stenosis.  (R. 131, 152, 218.)

5.  On May 13, 2002, Plaintiff underwent an excision of stenotic Tascon conduit with insertion of aortic homograft from right ventricle to pulmonary arteries for conduit obstruction.  (R. 120-125B, 127D, 151-153, 218, 222-25.)

6.  In August of 1998, Plaintiff underwent a pericardial patch reconstruction of the right ventricular to pulmonary artery conduit with insertion of a porcine valve.  (R. 149-50, 155.)

4

surgery.  (R. 76, 102-03, 110-12, 117, 228.)  He has been taking Tegretol since he was diagnosed in August 1998 and his seizures have been well-controlled with this medication.[7]  (R. 131-41; 155, 177, 214-15, 228, 243.)

Since Plaintiff's severe impairments are well-documented, the real issue in this appeal is whether the record supports the ALJ's finding that despite his severe impairments, Plaintiff is capable of performing substantial gainful activity.  At the time of the ALJ's decision on September 23, 2004, Plaintiff was twenty-three (23) years of age and is considered a younger person under the regulations.[8]  He has completed high school but has no formal education beyond that.  (R. 313-14.) Throughout his formal education, Plaintiff's teachers and parents developed an Individualized Education Plan ("IEP") designed to address Plaintiff's  special needs from an educational and vocational standpoint, and to ensure that those needs were met.[9]  (R. 197-212.)   Plaintiff attended special education classes in high school and a vo-tech school for a period of time during his senior year where he completed special training in EMT and security.[10]  (R. 77, 197, 314.) Although he has expressed an interest in going back to school to study juvenile justice, Plaintiff has not undertaken

---

7.  Plaintiff had one seizure in the summer of 2001 but this was attributed to his discontinuance of taking his medication.  (R. 228.)

8.  A younger person is one who is under age 50 and whose age generally will not seriously affect his ability to adjust to other work.  20 C.F.R. §§ 404.1563(c), 416.963(c).

9.  The IEP Goals and Objectives dated April 19, 1999 indicates that Plaintiff had significant difficulty with reading comprehension, fluency and accuracy, and with math computation and problem solving.  (R. 210.)  Plaintiff's Brigance scores as of April 19, 1999 were third grade and fifth grade levels for computation and problem solving, respectively; his scores for word recognition and comprehension were second grade and fourth grade levels, respectively.  (R. 210.)

10.  Plaintiff never pursued an EMT license/certification because of an intervening physical condition related to his congenital heart condition.

any further educational or vocational training.[11]  (R. 313, 315-16.)

      After his graduation from high school in 2000, Plaintiff continued to live with his parents for a period of time.  Approximately one and one-half years prior to the hearing on December 9, 2003, Plaintiff began living on his own in an apartment and for the last six months of this time, he shared the apartment with a roommate.  (R. 113, 324.)   Also, at the time of the hearing, Plaintiff was engaged to be married.  (R. 325.)

      At the time of the hearing in December of 2003, Plaintiff was working as a stock clerk for a supermarket (Giant Eagle) in Greenville, Pennsylvania, for the past four months.  (R. 306.)  Prior to that time, Plaintiff also worked as a bagger for Giant Eagle.  (R. 88, 306.)  He had been employed by Giant Eagle  for approximately seven years, during which time he normally worked 20 to 25 hours per week at the hourly rate of $ 5.45.  (R. 88, 306-07.)  On approximately 10 different occasions, Plaintiff claimed he attempted to work eight hours a day, but was unable to do so on a continued basis due to fatigue.  (R. 307-08.)

      Plaintiff's Work History Report dated October 29, 2002 (completed on Plaintiff's behalf by his father) lists three jobs that Plaintiff performed in the last 15 years: Giant Eagle, McDonalds, and White Cliff Nursing Home.  (R. 87.)  Although the Work History Report indicates that Plaintiff worked seven hours a day, five days a week, for Giant Eagle (R. 88), Plaintiff's statement in the Disability Report dated September 30, 2002 indicates that he worked four to five hours a day, five days a week, for Giant Eagle.  (R. 72.)  Moreover, Plaintiff's earnings record does not support a 35

---

11.  The Office of  Vocational Rehabilitation informed him that he needed additional tutoring before he could  go back to school.  At the time of the hearing on December 9, 2003, Plaintiff was being tutored twice a week for math and reading.  (R. 315-16.)

hour work week.  (R. 56.)    Rather, the earnings record indicates that since the alleged onset of disability, Plaintiff worked an average of 22.9 hours a week for Giant Eagle.  *See* note 13, *infra.*

The Work History Report also indicates that Plaintiff worked eight hours a day, five days a week as a nurses' aid at a nursing home from May of 2000 to February of 2001.  (R. 87, 90.) Plaintiff frequently lifted 25 pounds, and occasionally lifted 100 pounds or more.  (R. 90.) Plaintiff was terminated from this position because he was unable to perform all of his job duties due to limitations with his right arm and problems with endurance and pace.  (R. 318, 333.)

A close examination of Plaintiff's earnings record reveals that after graduation from high school in 2000,[12] Plaintiff was working two jobs–one was with a nursing home as a nurses' aid, and the other was with Giant Eagle as a bagger.  (R. 56.)  In 2000, Plaintiff earned gross wages of $9,354.94, or an average of $ 780.00 per month.  (R. 54.)  In 2001, the earnings record shows that Plaintiff continued to work as a bagger for the entire year and as a nurses aid until July of 2001.  (R. 56.)  In October of that year, in addition to his bagging job, the earnings record shows that Plaintiff began working at a fast food restaurant (McDonald's) cleaning and maintaining the cooking equipment.  (R. 56; 89.)  According to the earnings record, from all jobs in 2001, Plaintiff earned gross wages of $10,074.64, or an average of $ 840.00 per month.  (R. 54.)  In 2002, the earnings record shows that Plaintiff began the year working at both Giant Eagle and McDonald's.  (R. 56-57.) However, in August of 2002,  Plaintiff stopped working at McDonald's because of fatigue.  (R. 71; 86.)  According to the earnings record, his gross earnings in 2002 were $9,514.48, or an average of $ 793 per month.  (R. 54, 56.)  Since the alleged onset of his disability on September 1, 2002,

---

12.  Prior to graduating from high school, Plaintiff worked part-time as a bagger at Giant Eagle in 1997, and, in addition to working as a bagger, in 1998 and 1999, worked part-time as a nurses' aid.  (R. 55-57.)

however, Plaintiff's average monthly earnings were approximately $ 540.00 per month.[13]   (R. 56, 86.)   In 2003, the earnings record shows that Plaintiff continued working part-time at Giant Eagle, shifting from the bagger position to that of a stock clerk.   (R. 58-65, 306.)   According to the earnings record, he worked a total of 1,266 hours or an average of 24.3 hours per week.[14]   (R. 58-65.)   He earned gross wages of $ 6,907.27, or an average of $ 575.61 per month, in 2003.   (R. 65.)

In addition, the *Disability Report - Adult* completed by Plaintiff on September 30, 2002 also supports that Plaintiff worked an average of 22.9 hours per week since the alleged onset of his disability. With regard to his job as a bagger, Plaintiff indicated in the Disability Report that he spent four to five hours a day walking and standing, and he frequently lifted boxes of foods weighing 25 pounds, and occasionally lifted as much as 70 pounds.   (R. 72.)    On his Disability Report - Adult dated September 30, 2002, Plaintiff stated that his ability to work was limited because of his congenital heart defect and a stroke, which left his right side impaired.   (R. 71.)   As a result of these medical impairments, Plaintiff stated on the Disability Report that he was unable to "keep up to speed" with his job; his impairments "affect[ed his] thought process;" he "couldn't do cashier job because of this; had to quit one of [his] jobs because [he] was too tired."   (R. 71, 111.)

Plaintiff claims that if he does more than usual on a particular day, he has a problem with fatigue and coordination due to loss of use of his right arm and hand, and his legs easily get tired causing him to stumble a lot, as a result of the stroke.   (R. 95.)   Although he was able to live on his own, Plaintiff indicated that if he worked full-time, he would need help with cooking and cleaning.

---

13.  Plaintiff's total earnings from Giant Eagle in 2002 were $ 6,482.88, or an average of $ 540.24 per month.  (R. 56.)  Extrapolating the hours worked based on an hourly rate of $ 5.45 an hour, the total hours worked at Giant Eagle in 2002 were approximately 1,190.  This equates to an average of approximately 22.9 hours worked per week.

14.  The earnings record indicates that on only *one* occasion in 2003, Plaintiff worked 42.75 hours in one week (check dated August 14, 2003), and was paid 2.75 hours of overtime pay.  (R. 58.)

(R. 95-97.)  Plaintiff submits that he is able to drive a car with modifications to the throttle and steering wheel.  (R. 96, 114, 325.)  Plaintiff further submits that although he is able to mow the lawn, do yard work, and/or garden at his parents' house, he gets tired and/or short of breath.  (R. 96, 113, 329.)  Plaintiff is also able to bathe and dress himself, grocery shop, take out the trash, prepare/cook a meal, or use a vacuum cleaner; however, he requires assistance with tying his shoes due to the loss of use of his right hand.  (R. 96, 98, 114.)  In addition, Plaintiff claims that he requires assistance with reading his bills and important documents and paying his bills, due to his difficulties with  reading and math.[15]  (R. 96.)  Plaintiff also claims he requires assistance with laundry.  (R. 97.)  For enjoyment, Plaintiff is a cub scout leader, regularly maintains an aquarium, is involved in church activities, and goes shopping and to movies.  (R. 97, 113-15.)  With regard to stamina, energy level, and fatigue, Plaintiff claims he needs to take rests between activities if he works more than 35 to 40 hours per week, and that he had to quit his second job.  (R. 97, 111.)  Plaintiff denies experiencing any pain or limitations due to pain.  (R. 99-100.)

The medical records indicate that Plaintiff was treated at the Mayo Clinic in Rochester, Minnesota, from 1982 to 1999 by Gordon K. Danielson, M.D., Robert H. Feldt, M.D., and Douglas D. Mair, M.D.  (R. 121-127K, 131-161, 213-225.)  The hospital records, test results, and physician's notes substantiate Plaintiff's congenital heart defect, stroke, seizure disorder, and related impairments.  Of import is the hospital note on May 20, 1997, which indicates that Plaintiff complained of a decrease in exercise tolerance over the last few months.  (R. 126.)  With regard to

---

15.  Although Plaintiff indicated he required assistance with paying bills on his Disability Report dated September 30, 2002, he stated on the Daily Activity Questionnaire completed on November 5, 2003 in relation to his request for a hearing that he was able to pay his own bills and make change without assistance.  (R. 114.)  However, the state examining psychologist found that he was not capable of managing his financial affairs.  (R.257, 259.)

activity, the hospital note further indicates that Plaintiff paces himself; he tires but knows how to be active and rest.  (R. 126.)  In his report dated June 9, 1997, Dr. Feldt noted: "[Plaintiff] himself has noticed no change in his activity pattern but occasional skipped beats. [He] has a disability so that his stamina is primarily influenced by that.  He does note that he is short of breath after 15 or 20 minutes of basketball playing."  (R. 127.)  Dr. Feldt's reports and office notes further reflect the existence of a grade IV harsh systolic murmur heard well all over the precordium, especially along the sternal border.  (R.127E, 127I, 127K.)

The medical records further indicate that Plaintiff treated with pediatric cardiologist, Grace Lee Smith, M.D., from 1989 through the date of the hearing.  Dr. Smith's treatment notes on July 11, 2000 reflect that Plaintiff's "activity level has been normal and he is now applying to be a nurses' aide at a local nursing home."  (R. 230.) Dr. Smith's treatment notes further reflect on November 6, 2001 that Plaintiff "feels well and is working at 2 jobs, putting in 40-50 hours per week.  He denies easy fatigability."  (R. 228.)   In her report dated April 10, 2003, Dr. Jones opined that the stroke suffered by Plaintiff as an infant "result[ed] in significant motor and cognitive handicaps."  (R. 288.) Dr. Smith further opined:

> His hemiparesis causes easy fatigue.  [Plaintiff] is further disadvantaged by his congenital heart defect in that his physical stamina is markedly reduced due to insufficient blood flow to his lungs.  Future heart surgery and heart catheterizations will definitely be required throughout his adult life.  Unfortunately, these handicaps will persist, effectively limiting [Plaintiff's] employment opportunities.  Furthermore, his life span will be shortened because of his complex cardiac disease.

(R. 288.)

The medical records further indicate that Plaintiff has treated with Troy Jones, M.D., who

10

specializes in internal medicine, since September 1998. (R. 289.)   An office note in 2001 states "energy good. Works 40-50 hrs day." (R. 243.)  Dr. Jones was also Plaintiff's treating physician during his hospitalization in January 1999 at UPMC Horizon - Greenville. (R.162-196.)  In his report dated May 12, 2003, Dr. Jones opined that the stroke suffered by Plaintiff as an infant caused "destruction of approximately forty percent of his left cerebral hemisphere."  (R. 289.) Consequently, Dr. Jones stated that Plaintiff "has been left with significant cognitive dysfunction as well as a severe upper greater than lower right hemiparesis." (R. 289.)  Dr. Jones further opined:

> Mr. Meyer has done his best to seek employment and hold employment as possible given his limitations.  Mr. Meyer tires easily as he is required to compensate for the right hemiparesis by using the left side of his body for the bulk of his ability.  He has almost no use of the right arm and also has difficulty with proprioception.  This sometimes leads to clumsiness, which has proven to be at times a frustration, and at other times a hazard to himself and others in the work place.
>
> Mr. Meyer also suffers from seizures and is required to be on life long anticonvulsant therapy.  These drugs also lead to fatigue and limit the number of hours he can work.
>
> Cognitively, Mr. Meyer's (sic) has good verbal skills and reasonable short term and long term memory for verbal material. However, he does have significant difficulty with reading more than a few words at a time.  He also has difficulty retaining what he has read.  This also has been problematic in the work place.

(R. 289.)

A consultative disability examination (physical) was conducted by C. James Poolos, M.D. on November 15, 2002 at the request of the Pennsylvania Bureau of Disability Determination.   (R. 247.)   Dr. Poolos reported that Plaintiff's history was significant for a congenital heart defect, a stroke resulting in right hemiparesis, and seizure disorder. (R. 247.)  On physical examination, Dr. Poolos noted the existence of a heart murmur and scars from previous heart surgeries. (R. 248-49.)

11

As to Plaintiff's respiratory system, Dr. Poolos noted occasional shortness of breath with physical activity, but no history of cough, hemoptysis, wheezing or pleuritic pain. (R. 248.) With regard to the musculoskeletal system, Dr. Poolos noted obvious atrophy of the right arm and leg, a flexion contracture of approximately 45 degrees in the right elbow, right wrist drop and foot drop. (R. 249.) Neurologically, Dr. Poolos observed Plaintiff's reflexes on the right side were 3/4 compared to the left, and a marked decrease in right hand grip of approximately 10 percent of predicted normal; as to strength, there was no obvious weakness when resistance was applied to the flexors and extensors of the lower extremities except for a right foot drop, and a slight decrease in resistance to the flexors and extensors of the right arm (4/5) compared to the left side which was 5/5. (R. 249.) Dr. Poolos further observed that Plaintiff's gait was impaired because of a right-sided weakness and right foot drop. (R. 249.) Dr. Poolos' final impression was "1. Status post cardiovascular surgery for correction of transposition of the great vessels and porcine valve insertion. 2. Status post CVA. 3. Postop convulsive disorder. 4. Status post endocarditis. 5. Mild mental retardation." (R. 249-50.)

A clinical psychological disability evaluation was conducted by Mark Goral, Ph.D., a clinical psychologist, on February 3, 2003 at the request of the Pennsylvania Bureau of Disability Determination. During the behavioral observation and mental status evaluation, Plaintiff stated he attempts to budget his money relatively well. (R. 254.) Dr. Goral's superficial testing of math skills during the mental status evaluation revealed that Plaintiff was able to solve one of two simple multiplication problems and correctly count from one to ten. (R. 254.) Superficial testing in several other skill areas by Dr. Goral revealed that Plaintiff accurately named the colors in the USA flag, accurately provided the names of four U.S. presidents since 1950, had average skills in solving absurdities, had excellent skills in solving analogies, had above average skills in solving the

similarities between word pairs, had intact short-term and long-term memories, and had excellent skills in social judgment. (R. 254.) On the other hand, Dr. Goral's superficial testing revealed Plaintiff was unable to accurately describe who Cleopatra was, had poor skills in solving two different proverbs, was unable to spell the word "world" backwards, and had poor skills in test judgment. (R. 254.)

Plaintiff stated to Dr. Goral that he had slight difficulties controlling aggressive and hostile impulses, and readily admitted he had much difficulty, at times, in controlling his sexual and amorous impulses. (R. 254.)

Significantly, when asked if he felt he had any problems or was aware of having any problems, Plaintiff stated to Dr. Goral that he felt he had no problems and did not feel he needed help for any problems at that time. (R. 254.)

As to the effect of Plaintiff's impairments on functioning, Dr. Goral reported that he is able to engage in most activities of daily living.[16] (R. 255.) As to social functioning, Dr. Goral reported that Plaintiff gets along well with others, including co-workers and authority figures, and is involved in his church and with the cub scouts. (R. 255.) Dr. Goral further reported that most of the time, Plaintiff communicated clearly. (R. 255.) With regard to concentration, persistence and pace, Dr. Goral noted that Plaintiff is able to understand, remember and carry out simple instructions. (R. 255.) However, Dr. Goral reported that he performs fairly with detailed instructions and poorly with complex instructions. (R. 255.) Although Plaintiff reacts generally well to deadlines and schedules

---

16. Dr. Goral reported that Plaintiff regularly engages in cleaning tasks; he also makes simple meals, cooks 2-3 days a week, goes grocery shopping, is able to make needed repairs to his residence, and demonstrates excellent personal hygiene and grooming. (R. 255.) Dr. Goral also reported Plaintiff stated he usually pays his bills in a timely fashion; however, based on the results of the achievement and intelligence tests administered to Plaintiff, Dr. Goral concluded Plaintiff is not fully able to competently manage his financial affairs. (R. 257.)

and shows good skills in remembering his appointments, Dr. Goral found he reacted poorly to failure. (R. 255.) Dr. Goral further found that Plaintiff showed fair skills in sustaining routines, was able to pace himself on most tasks, and persisted at difficult tasks rather than give up easily. (R. 256.) In addition, Dr. Goral found that Plaintiff exhibited a fair ability to make decisions. (R. 256.)

On the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) test administered by Dr. Goral, Plaintiff earned identical scores of 76 on the Verbal and Performance IQ; his Full Scale IQ was 74. (R. 256.) Dr. Goral noted that these IQ scores fell within the borderline range of intelligence. (R. 256.) Plaintiff's performance on a similarities subtest showed general weakness and was much lower than a superficial testing of his skills with similarities during the Mental Status Evaluation. (R. 256.)

Dr. Goral also administered the Wide Range Achievement Test - Revision 3 (WRAT3), which revealed that Plaintiff performs at a second grade level in reading, spelling and arithmetic. (R. 257.) Moreover, comparing the results of Plaintiff's Verbal IQ and Full Scale IQ with his standard scores from the WRAT3, Dr. Goral concluded that Plaintiff qualified for two separate learning disorders: a reading disorder and a math disorder.[17] (R. 257.)

Given that Plaintiff functions in the borderline range of intelligence, has extremely low scores in his achievement testing revealing a second grade equivalency, combined with Plaintiff's generally low score on Arithmetic in the WAIS-III, Dr. Goral determined that Plaintiff was not fully able to

---

17. According to the American Psychiatric Association, adults with learning disorders may have significant difficulties in employment. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 47 (4th ed. 1994) (hereinafter "*Diagnostic & Stat. Man.*"). In addition, the APA notes that underling abnormalities in cognitive functioning may often precede or be associated with learning disorders, such as deficiencies in visual perception, linguistic processes, attention or memory, or any combination thereof. *Id.* In fact, the Special Education Comprehensive Evaluation Reports prepared by Greenville High School for Plaintiff in grades 8 and 10 both indicate that historically, Plaintiff had difficulty with concentration and attention. (R. 128, 130.) In eighth grade, the Report indicates that Plaintiff was taking medication (Ritalin) to address his difficulty with attention. (R. 130.)

competently manage his own financial affairs.  (R. 257, 259.)  Notably, Dr. Goral's diagnostic impression included a current Global Assessment of Functioning ("GAF") score of 50.[18]  (R. 258.)

With regard to Plaintiff's ability to make occupational adjustments, Dr. Goral opined that his ability to follow work rules, deal with the public, interact with supervisors, and maintain attention/concentration was good, and his ability to relate to co-workers was unlimited/very good. (R. 258.)  However, Dr. Goral rated Plaintiff's ability to deal with work stressors and function independently as fair.  (R. 258.)

As to Plaintiff's ability to make performance adjustments, Dr. Goral opined that his ability to understand, remember and carry out *simple* job instructions was good.  However, Dr. Goral rated Plaintiff's ability to understand, remember and carry out *detailed but not complex* job instructions as fair, and if the job instructions were *complex,* Dr. Goral rated Plaintiff's ability to understand, remember and carry out job instructions as poor/none.  (R. 258.)

Dr. Goral rated Plaintiff's ability to make personal-social adjustments between good to unlimited/very good.  (R. 258.)

With regard to other work related activities, Dr. Goral opined that:

> [Plaintiff's] major difficulties are moderately limiting and severely limiting in specific areas.  Moderate limitations would appear to be his overall incapacity with his right arm and right hand. [Plaintiff] also shows moderate difficulties in carrying out detailed and complex instructions on jobs.  He is not able to fully deal with major work stresses or to function independently to any acceptable degree, due to his own difficulties.  However, [Plaintiff] does reveal a borderline

---

18.  Plaintiff's GAF score for the highest level in the year leading up to his disability evaluation was also 50.  (R. 258.)  The GAF scale ranges from 100 to 1, and assesses "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  *Diagnostic & Stat. Man.* at 30-32.  A score in the 50-41 ranges indicates "**[s]erious symptoms** (*e.g.,* suicidal ideaton, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (*e.g.,* no friends, unable to keep a job)."  *Id.* at 32 (emphasis in original).

level of intelligence.  This would compromise him in all domains of functioning.  Of import is the fact that he meets diagnostic criteria for both a reading disorder as well as a mathematics disorder.  It is this clinician's opinion that [Plaintiff] is unable to independently manage his monetary assets or to budget to any acceptable degree, based upon his intellectual and achievement test results. [Plaintiff's] reading level is also quite low and would be considered to be almost functionally illiterate based upon his performance in [the] achievement testing.

[Plaintiff] shows excellent assets in his social-interactive skills and his love of being with people.  Nevertheless, his long-term placement in special education and his difficulties with learning disorders would show that he is impaired with job tasks that are any larger than simplistic.

It is this clinician's opinion that [Plaintiff's] overall prognosis at the present time is guarded.

(R. 258-59.)  Finally, Dr. Goral concluded that Plaintiff was unable to manage benefits in his own best interest.  (R. 259.)

On February 14, 2003, D.S. Kar, M.D., a non-examining and non-treating physician, completed a residual functional capacity assessment (physical).  (R. 261-70.)  With regard to exertional limitations, Dr. Kar found that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; stand and/or walk and sit (with normal breaks) for approximately six hours in an eight-hour work day; push and/or pull (including operation of hand and/or foot controls) without limitation.  (R. 262.)  Dr. Kar further found no postural, manipulative, visual, communicative, or environmental limitations.  (R. 263-66.)  Incredibly, Dr. Kar found no limitation with regard to handling (gross manipulation) or fingering (fine manipulation), despite the uncontradicted evidence in the record of right hemiparesis affecting the use of Plaintiff's right hand, arm, and leg, including impaired gait.  Indeed, Dr. Kar acknowledges these impairments but misstates the extent and/or effect of these impairments on Plaintiff in making his assessment, relying

16

primarily on Plaintiff's statements regarding his ability to engage in activities of daily living.  (R. 270.)  Dr. Kar thus concludes that Plaintiff's statements regarding his limitations are partially credible.  (R. 270.)

On March 18, 2003, Sanford Golin, Ph.D., a non-examining and non-treating clinical psychologist, completed a RFC assessment - mental.  (R. 271-87.)  Dr. Golin indicated in his assessment that he gave great weight to the report of Dr. Goral dated February 3, 2003 in making the mental functioning assessment.  (R. 273.)  Dr. Golin rated Plaintiff as moderately limited in being able to perform the following mental activities:  to understand, remember, and carry out detailed instructions; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to respond appropriately to changes in the work setting; and, to set realistic goals or make plans independently of others.  (R. 271-72, 284.)  Dr. Golin rated Plaintiff as not significantly limited, or mildly limited, in being able to perform the following mental activities: to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards

17

and take appropriate precautions; and, to travel in unfamiliar places or use public transportation.  (R. 271-72, 284.)

On September 8, 2003, Plaintiff consulted with Stephen G. Paxson, D.O., a board certified physiatrist, in relation to the spasticity of his right arm.  (R. 290-91.)  Dr. Paxson examined Plaintiff and evaluated his condition to determine treatment options for improved functionality of his right arm.  (*Id.*)  Upon examination, Dr. Paxson noted Plaintiff's right upper extremity revealed deformity and muscle atrophy, and that Plaintiff "almost comes across as having a clunky-type palsy, but it is not." (R. 290.)  Dr. Paxson further observed that his "right upper extremity showed some atrophy both proximally and distally with spasticity," and noted the presence of flexor synergy.[19]  (R. 290.)  Dr. Paxson's diagnosis was spasticity of moderate to moderately severe dysfunction of right upper extremity, and spasticity and flexor synergy of right upper extremity.  (R. 291.)  Dr. Paxson recommended that Plaintiff be seen by occupational therapy and consult with orthotics for a functional brace for his right arm, and showed him some neuromuscular facet activity exercises.  (R. 291.)

A hearing was held before the ALJ on December 9, 2003, at which time Plaintiff testified in support of his disability claim.  (R. 304-38.)  The ALJ questioned Plaintiff as to whether there was a decrease in the number of hours he worked as of September 1, 2002, the alleged disability onset date, to which Plaintiff responded affirmatively.  (R. 310.)  When questioned further about the reason for the decrease, Plaintiff stated that his employer (Giant Eagle) did not have the hours to schedule him.  (R. 311, 318.)  Plaintiff further stated that although he was only scheduled to work twelve

---

19.  Dr. Paxson also noted during his examination that Plaintiff has a little problem with higher cognitive function. (R. 290.)   Dr. Paxson had to explain one of the proposed treatments, Baclofen injections, from a very simplistic standpoint to make it easier for Plaintiff to understand.  (R. 291.)

hours the previous week, he was available to work more hours.  (R. 312.)  When asked how many full-time employees worked at Giant Eagle, Plaintiff responded that the only full-time employees were the office staff and managers.  (R. 319.)

With regard to the limitations in using his right upper extremities, Plaintiff stated he is unable to lift a grocery bag or a 10-pound bag of potatoes with his right hand, but he can lift and/or hold a pencil, paper plate, and a book with his right hand, but as to the latter, only for a short time.  (R. 319-21.)  Plaintiff further testified that he has a problem grasping with his right hand, but can grasp a steering wheel to drive.  (R. 320-22.)  He is able to use his right hand to balance large objects (boxes) that he picks up with his left hand, although he cannot hold the weight of the box with his right arm.  (R. 321, 323.)  Nor can he use his right arm to open a sliding door.  (R. 323.)

With regard to the use of his right lower extremities, Plaintiff testified that he generally does not have a problem walking short distances, but he gets tired if it is more than a short distance or longer than 15 minutes.  (R. 323-24, 338.)

As to stamina, fatigue, concentration and pace, Plaintiff testified that his congenital heart problem and related seizures limit his activities in that he tires easily, especially on the seizure medication.  (R. 326, 328, 336.)  Plaintiff further testified that he had difficulties with concentration and fatigue when he worked eight hours a day.  (R. 333-34.)  If required to work more than 20 to 25 hours per week, Plaintiff stated he would not be able to keep pace, and is at risk of being injured.  (R. 336-37.)  According to Plaintiff, when he gets tired, he has to sit down, stop, and catch his breath.  (R. 328.)   Lifting and walking fast at work make him tired, which requires that he take breaks, five minutes in duration, two to three times in a four-hour period (or four to six times in an eight-hour period) in addition to his regularly scheduled breaks.  (R. 328-29, 334-35.)

19

The ALJ asked Plaintiff if he thought he was disabled, to which Plaintiff responded: "In my – head, no, but it would be great to have extra money because in like, everybody's eyes, I have a disability." (R. 331.)

At the December 9, 2003 hearing, the vocational expert (VE), Samuel Edelman, questioned Plaintiff regarding his work experience. (R. 339-40.) Plaintiff responded that he worked at both Giant Eagle and the nursing home at the same time, and later worked at McDonald's and Giant Eagle at the same time. (R. 339.) From November 2001 to August 2002, Plaintiff stated he worked two jobs, approximately 50 to 55 hours per week. (R. 340.) The VE then testified that Plaintiff's past work as a stock clerk and bagger at Giant Eagle fits in the medium and unskilled range of work. (R. 340.) The VE further testified that Plaintiff's work at McDonald's as a crew person would be light and unskilled, and his work at the nursing home, without certification, would be heavy and unskilled. (R. 340.)

Next, the ALJ posed the following hypothetical question to the VE:

> Assuming we have an individual with the same age, education, and work experience as the Claimant. Assume further that such an individual would be capable of work at the light exertional level. Assume the individual could avoid hazards, [INAUDIBLE] would expose this individual to – a possibility to be cut. Work should be simple routine in nature, not involving reading and math skills, and not more than two steps. Work should not involve any strict production standards such as piecework and the overall stress level under a one to 10-point scale should be less than four, four or less. Given that hypothetical, would such an individual be able to work in any of the Claimant's past work?

(R. 340-41.) The VE opined that such an individual could do some of the crew work at McDonald's, but could not be a cook there. (R. 341.) The VE further opined that such an individual could not perform the stock clerk job at Giant Eagle, but could perform stock clerk work at the light

level of exertion.  (R. 341.)  He testified that 193,000 stock clerk jobs at the light level of exertion exist nationally.  (R. 341.)  In addition, the VE opined that such an individual could also perform a job as a security guard, sales clerk, or cashier (with use of a modern cash register), and that 318,000, 280,000, and 400,000 jobs existed nationally at the light level of exertion in these respective occupations.  (R. 341.)

Counsel for Plaintiff then questioned the VE as to whether there would be other jobs that such an individual could perform if this individual would have "difficulties with completability [phonetic], and after a period of four to six hours of work, . . . would be in a compromised position of not being able to concentrate or keep their pace, consistent with the normal duties of the stocking job . . .."  (R. 341-42.)  The VE responded that in his opinion, no person could perform the stock clerk job at the sedentary to moderate level of exertion with a concentration issue.  (R. 342.) Counsel for Plaintiff also asked the VE to consider whether other jobs existed that Plaintiff could perform under the following additional conditions: an individual with the same age, education, and work experience, performing sedentary type jobs, such as cleaning fish tanks and cleaning around his apartment, which do not involve lifting more than 10 pounds or lifting overhead, more than normal occasional walking, working for more than four to six hours, and which involve loss of concentration and pace.  (R. 342-43.)  The VE opined that under those circumstances, no jobs exist that Plaintiff could perform.  (R. 343.)  Next, Plaintiff's counsel asked the VE to consider whether an individual would be capable of sustaining substantial gainful work activity if he took as many as six unscheduled breaks with a duration of five minutes each in an eight-hour work day, in addition to the normal breaks allowed in most occupations, to which the VE responded "[n]ot with the [INAUDIBLE]."  (R. 343.)

The ALJ then asked Plaintiff's counsel how the nine-month period in which Plaintiff worked about 55 hours per week from his two jobs should factor into her decision.  (R. 343.)  Plaintiff's counsel replied that during this nine-month period, Plaintiff worked four hours in the morning, came home and slept, then worked another four hours, and that this work schedule caused his condition to worsen, which was the primary reason he stopped working at McDonalds.  (R. 344.)  Plaintiff's counsel maintained that the nine-month period where Plaintiff worked two jobs should be considered an unsuccessful work attempt.  (R. 344.)  Plaintiff's counsel further argued that although the medical record does not support a finding that his condition worsened, it does indicate that his treating physicians did not advise him to work that much, and the office notes of Doctors Jones and Smith indicate that his seizure medication and his heart defect affect his physical stamina causing him to fatigue easily.  (R. 346.)  The ALJ stated that the primary issue for her to decide is whether Plaintiff is engaging in substantial gainful activity.  (R. 346.)

### C.    "Substantial Evidence" Standard of Review

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner. 42 U.S.C. § 405(g).  *See also, e.g.*, *Richardson v. Perales*, 402 U.S. 389 (1971); *Adorno v. Shalala*, 40 F.3d 43 (3d Cir. 1994).

More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)); *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999). Although there may be contradictory evidence in the record, and/or although this Court may have found otherwise, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).

The Third Circuit has noted that evidence is not substantial "if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983); *see also Gilliland v. Heckler*, 786 F.2d 178, 183 (3d Cir. 1986). In addition, despite the deference due to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981). Finally, the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Fargnoli v. Massanari*, 247 F.3d 34, 44 n. 7 (3d Cir. 2001) (quoting *SEC v. Chenery*, 318 U.S. 80, 87 (1943)).

**D.  <u>Disability Evaluation</u>**

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the findings of the Commissioner that Plaintiff was not disabled within the meaning of the Act, but had the residual functional capacity to perform a form of substantial gainful employment.

The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

23

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. § 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.  For
> purposes of the preceding sentence  . . . 'work which exists in the
> national economy' means work which exists in significant numbers
> either in the region where such individual lives or in several regions
> of the country.

A "physical or mental impairment" is "an impairment that results from anatomical,
physiological, or psychological abnormalities which are demonstrable by medically acceptable
clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).[20]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine
disability.  The regulations, published at 20 C.F.R. §§404.1501-1529, set forth an orderly and logical

---

20.  In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and
vocational evidence.  *See Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective
complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical
evidence"); *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant,
although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course,
the claimant satisfies the requisite burden of proof.").

In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other
evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of her
daily activities.  *See Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).  And so long as a plaintiff's subjective
complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial
evidence review discussed in Section C, *supra*.  *See  Good v. Weinberger*, 389 F. Supp. 350, 353 (W.D. Pa. 1975)
(discussing *Bittel* and concluding that where  "plaintiff did not satisfy the fact finder in this regard, so long as proper
criteria were used, [it] is not for us to question"); *see also Kephart v. Richardson*, 505 F.2d 1085, 1089 (3d Cir.
1976) (noting that credibility determinations of ALJ are entitled to deference).

sequential process for evaluating all disability claims.[21]  In this sequence, the ALJ must first decide whether the claimant is engaging in substantial gainful activity.  If not, then the severity of the claimant's impairment must be considered.  If the impairment is severe, then it must be determined whether it meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability.  If the impairment does not meet or equal the Listings, then it must be ascertained whether the claimant can do his past relevant work.  If not, then the residual functional capacity ("RFC") of the claimant must be ascertained, considering all the medical evidence in the file, to assess whether the claimant has the ability to perform other work existing in the national economy in light of claimant's age, education and past work experience.[22]

A finding by the ALJ that the claimant is unable to perform his past relevant work will satisfy her burden and the burden then shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates his residual functional capacity. *See* 20 CFR § 404.1520; *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984).[23]  Thus, it must be determined whether or not there is substantial evidence in the record to support the ALJ's

---

21.  This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. *See, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

22.  The finding of residual functional capacity is the key to the remainder of findings under the regulations.  If the claimant's impairment is exertional only, (*i.e.,* one which limits the strength he can exert in engaging in work activity), and if him impairment enables him to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made.  If the facts of the specific case do not coincide with the parameters of one of the rules, or if the claimant has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts.  *See* 20 C.F.R. § 404.1569; Appendix 2 to Subpart P of Part 404, Title 20, § 200.00(a).

23.  The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert. *See Jesurum v. Sec'y of the U.S. Dep't of Health & Human Serv.*, 48 F.3d 114, 119 (3d Cir. 1995).

conclusion that Plaintiff was not disabled within the meaning of the Social Security Act.

### E.    Analysis

As noted above, Plaintiff complains on appeal that the ALJ's decision is not supported by substantial evidence and challenges it on the grounds that the ALJ: (1)  failed to properly consider valid medical evidence of record in declining to accord appropriate weight to the medical assessments of Plaintiff's treating physicians, Doctors Smith and Jones; (2) completely ignored the Global Assessment of Functioning assessed by the consultative examining physician, Dr. Goral; and (3) failed to set forth adequate reasons for rejecting Plaintiff's testimony regarding his limitations. Defendant argues, however, that the Commissioner's decision is supported by substantial evidence.

### 1.    ALJ's Partial Rejection of Treating Cardiologist's Opinion

At issue here is whether substantial evidence supports the ALJ's determination that Plaintiff retained the RFC to perform the exertional demands of light work which does not expose him to hazards and involves simple, routine and repetitive work not requiring reading or math skills or more than three steps that is in a low stress work environment and does not involve strict production standards, and that Plaintiff's past job as a crew person at McDonald's fits within his RFC.  In reaching this conclusion, the ALJ rejected in part the April 10, 2003 opinion of Plaintiff's treating cardiologist, Dr. Grace Smith, and failed to give it full credibility based on:  (1) an allegedly contradictory treatment note made by Dr. Smith on November 6, 2001, and (2) Plaintiff's description of his activities of daily living, as given to Dr. Goral during the clinical psychological disability consultative evaluation.  (R. 18.)

In determining eligibility for disability benefits, the ALJ is required to accord the reports of the treating physicians great weight, especially "'when their opinions reflect expert judgment based

on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999)) (other citations omitted).  If the "opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ must choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Id.* at 317 (quoting *Plummer,* 186 F.3d at 429) (other citation omitted).  The ALJ is required to consider the medical findings that support the opinion of a treating physician that the claimant is disabled.  *Id.*  (citation omitted).  If the ALJ chooses to reject the treating physician's evaluation, he "may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion."  *Id.* at 317-18 (quoting *Plummer,* 186 F.3d at 429) (other citations omitted).  Moreover, the Court of Appeals noted that this principle is especially profound where a mental disability is involved.  *Id.* at 319.  In this regard, the Court of Appeals opined that "an ALJ's personal observations of the claimant 'carry little weight in cases . . . involving medically substantiated psychiatric disability.'" *Id.* (quoting *Daring v. Heckler,* 727 F.2d 64, 70 (3d Cir. 1984)).

In the instant matter, the ALJ did not give full credit to Dr. Smith's opinion that Plaintiff's hemiparesis causes easy fatigue, and that his physical stamina is markedly reduced due to insufficient blood flow to his lungs, based, in part, on the following treatment note dated November 6, 2001 describing Plaintiff's symptoms at the time: "[plaintiff] feels well and is working at 2 jobs, putting in 40-50 hours per week.  He denies easy fatigability." (R. 228.)  In  relying on this treatment note to discredit Dr. Smith's opinion, the ALJ specifically found that Plaintiff's description of his condition was made two months *after* the alleged onset date of Plaintiff's disability. However, the

ALJ's conclusion is based on a mistaken fact– that the alleged onset date was September 1, *2001*,

when, in fact, the alleged onset date is September 1, *2002*.  Thus, the symptoms described in Dr.

Smith's treatment note were noted ten months *prior* to the alleged onset date.  Therefore, to the

extent the ALJ relied on the timing of the treatment note vis a vis the alleged onset date in partially

rejecting Dr. Smith's opinion, that rejection is without foundation.  Moreover, although Plaintiff

denied easy fatigibility in November 2001, the ALJ may not infer from this statement alone that

Plaintiff, in fact, was not experiencing fatigue ten months later in August/September 2002 where

there is a complete lack of objective medical evidence to support the ALJ's finding.

In addition, the ALJ's explanation of the weight accorded Dr. Smith's opinion is inadequate.

When a treating physician's opinion on the nature and severity of a claimant's impairments is well-

supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

inconsistent with the other substantial evidence in the record, the ALJ is required to give that opinion

controlling weight.  *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. §

404.1527(d)(2)).  Where, as here, the ALJ failed to give Dr. Smith's opinion controlling weight, the

ALJ is required to explain the weight assigned to her opinion, giving due consideration to the nature,

extent and length of the treatment relationship; frequency of examination; the supportability of the

opinion by medical signs and laboratory findings; the consistency of the opinion with the record as

a whole; and whether Dr. Smith is a specialist in the area upon which she is offering an opinion.  20

C.F.R. § 404.1527(d)(2)(i) and (ii), (d)(3) - (6).  The record contains no such explanation.

Dr. Smith, a cardiologist who had been treating Plaintiff since 1989, opined in April 2003

that Plaintiff's hemiparesis causes easy fatigue and his congenital heart defect  causes a marked

reduction in physical stamina due to insufficient blood flow to his lungs.  Dr. Smith further opined

that Plaintiff would require future heart surgery and catheterizations and his handicaps will persist, effectively limiting his employment opportunities and shortening his life span.  (R. 288.)   This explanation was based on over thirteen years of treatment of Plaintiff with regard to his congenital heart defect and complications therefrom.

Plaintiff's impairments are not in dispute–he has been diagnosed with a congenital heart defect; a stroke which has resulted in right hemiplegia, mild mental retardation, and reading and math learning disorders; and a seizure disorder.  Decreased stamina, fatigue, and shortness of breath are medically documented symptoms that can reasonably be expected to result from some or all of Plaintiff's impairments.  (R. 127, 289.)   These symptoms have been noted by Plaintiff's treating physicians since 1990.  (R. 126-27.)  For example, the hospital notes from the Mayo Clinic dated May 20, 1997 indicate that Plaintiff complained of decreased exercise tolerance over the last few months; that he must pace himself; he tires but knows how to be active and rest.[24]  (R. 126.)  On June 9, 1997, Dr. Feldt noted that Plaintiff has a disability so that his stamina is primarily influenced by that; Plaintiff is short of breath after 15-20 minutes of playing basketball.[25]  (R. 127.)  In a report dated June 26, 1990, Dr. Feldt stated that Plaintiff's physical activity is somewhat modified by his previous right hemiplegia.  (R. 127E.)  Inexplicably, the ALJ fails to acknowledge the medical findings of the Mayo Clinic.

Dr. Jones, who has treated Plaintiff since 1998, noted in May 2003 that Plaintiff has put forth his best efforts to seek and hold employment despite his limitations.  (R. 289.)  Dr. Jones further

---

24.  Plaintiff was being treated for an obstruction of the conduit valve at the time.

25.  In May of 1997, Plaintiff was a freshman in high school.  (R. 127G.)  The only other time Plaintiff played basketball was approximately one month prior to the hearing on December 9, 2003.  (R. 324.)

opined that Plaintiff tires easily as he is required to compensate for the right hemiparesis by using the left side of his body for the bulk of his ability, and that the anticonvulsant medication that Plaintiff takes for seizures also leads to fatigue and limits the number of hours he can work. (R. 289.)   The ALJ fails to acknowledge Dr. Jones' opinion as to the effect of Plaintiff's symptoms and/or impairments on his ability to work.[26]

Plaintiff's other treating physician, Dr. Paxson, a physiatrist, saw Plaintiff on one occasion for examination of his right arm function and recommended treatment for improved functionality. Dr. Paxson's examination revealed spasticity, flexor synergy, and moderate to moderately severe dysfunction of the right arm. (R. 291.) He also observed that Plaintiff had a problem with higher cognitive function, but is able to drive and is functionally independent. (R. 290.)   Again, in her decision, the ALJ focused on Dr. Paxson's comments regarding Plaintiff's activity levels and disregarded the portion of his report discussing Plaintiff's physical impairment and the effect of that impairment on his ability to work.

In addition to the reports and records of Plaintiff's treating physicians, the disability evaluation reports of the DDS examining physician and clinical psychologist, Dr. Poolos and Dr. Goral, respectively, support rather than contradict, Dr. Smith's opinion. Dr. Poolos, who conducted a physical examination of Plaintiff on November 15, 2002, noted occasional shortness of breath with physical activity, obvious atrophy of the right arm and leg, a flexion contracture of approximately

---

26. The ALJ fails to explain the weight given to the report of Dr. Troy Jones, Plaintiff's treating physician since 1998. A specialist in internal medicine and Plaintiff's attending physician during his hospitalization for treatment of bacterial endocarditis, Dr. Jones certainly appears to have knowledge regarding the effect of Plaintiff's physical impairments on his ability to work. Yet the ALJ completely ignored Dr. Jone's opinion in this regard and instead focused solely on Dr. Jones' observations regarding Plaintiff's cognitive abilities vis a vis his reading and retention difficulties, verbal skills, and short and long-term memory. (R. 19.)   No explanation is given by the ALJ for her partial acceptance and rejection of Dr. Jones' report.

45 degrees in the right elbow, right wrist drop, a marked decrease in right hand grip, and impaired

gait due to right-sided weakness and right foot drop. (R. 248-49.)   Dr. Poolos' final impression of

Plaintiff's physical impairments confirmed the medical findings/diagnoses of Plaintiff's treating

physicians. (R. 249-50.)

Dr. Goral, conducted a psychological disability evaluation which included a mental

examination as well as the administration of achievement and intelligence tests.  Based on his

examination and the test results, Dr. Goral noted major difficulties, moderately to severely limiting

in certain areas, and ultimately opined that Plaintiff is impaired with job tasks that are any larger than

simplistic, and his overall prognosis is guarded. (R. 258-59.) Dr. Goral's opinion appears to support

the opinions of Plaintiff's treating physicians, Doctors Smith and Jones.  Yet, the ALJ fails to

mention this part of Dr. Goral's report, as well as Plaintiff's GAF score of 50, and instead focused

solely on the portion of Dr. Goral's report that indicated that Plaintiff can understand, remember and

carry out simple job instructions, follow work rules, use judgment, maintain attention and

concentration, and interact with the public, supervisors and co-workers, in concluding that Plaintiff's

borderline intellectual functioning and reading and math disorders do not place significant

limitations on Plaintiff's ability to function.[27]  (R. 19.)  Yet again, the ALJ fails to provide any

explanation for her rejection of those portions of Dr. Goral's findings and conclusion that support

the opinions of Dr. Smith and Dr. Jones.

In discrediting Dr. Smith's opinion, the ALJ also relied on Plaintiff's statements to Dr. Goral

during the DDS disability evaluation–mental regarding his ability to engage in non-work activities

---

27.  The ALJ's determination is simply irreconcilable with Dr. Goral's findings and conclusion as to the effect of
Plaintiff's physical and mental impairments on his ability to work.

while working 20 to 40 hours a week at Giant Eagle.  Here, the ALJ found that Plaintiff reported to Dr. Goral that he is able to perform household chores such as cleaning and cooking without problems, go grocery shopping, maintain his residence for needed repairs, is involved in a church group, and volunteers as a cub scout leader.  Based on these non-work activities as related by Plaintiff, the ALJ concluded that an individual who is able to perform all of these activities, in addition to working 20-40 hours a week at Giant Eagle, is not easily fatigued.  (R. 18.)  However, the ALJ's judgment regarding the affect of Plaintiff's non-work activities on his ability to work does not provide a sufficient basis to reject a treating physician's opinion.  An ALJ's credibility judgment of the claimant alone is insufficient and cannot override the medical opinion of a treating physician that is supported by the record.  *Morales,* 225 F.3d at 318; *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir. 1985) (ALJ improperly discredited treating physician's opinion by impermissibly substituting his own judgment for that of the physician by independently reviewing and interpreting laboratory reports); *Dombroski v. Apfel,* No. Civ. A. 97-3273, 1998 WL 372551, *3 (E.D.Pa. May 15, 1998) (citing *Gilliland v. Heckler,* 786 F.2d at184; *Fowler v. Califano,* 596 F.2d 600, 602 (3d Cir. 1979)) (ALJ substituted his own medical judgment for that of physician who conducted neuropsychological examination when he discounted physician's report without referring to contradictory objective medical evidence) (footnote omitted).  Here the ALJ's refusal to give full credit to Dr. Smith's opinion must be based on objective medical evidence.  The ALJ does not point to any medical evidence in the record to support her partial rejection of Dr. Smith's opinion.  Rather, the ALJ's rejection of Dr. Smith's opinion based on Plaintiff's ability to engage in  non-work activities was due to her own credibility judgment, speculation and/or lay opinion.

Even if this non-medical evidence was a sufficient basis to reject Dr. Smith's opinion, the

ALJ's analysis of the non-medical evidence is problematic as she does not accurately recount all of Plaintiff's testimony and written statements concerning the extent of and limitations on these daily activities. As discussed more fully *infra,* the ALJ does not appear to have considered all of this evidence or explained her treatment of it. Therefore, it was error for the ALJ to reject Dr. Smith's opinion based on less than a full consideration of all relevant evidence without any explanation or conciliation.

The ALJ's conclusion is nothing more than her own personal observation and speculation as to whether Plaintiff is easily fatigued. She does not point to any objective medical evidence that supports her conclusion, and indeed, the ALJ's conclusion is in direct conflict with all of the objective medical evidence of record. Therefore, the Court finds that the ALJ's rejection of Dr. Smith's opinion is not supported by substantial evidence.

### 2.    Plaintiff's Residual Functioning Capacity

"'Residual functioning capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairments.'" *Fargnoli*, 247 F.3d at 40 (quoting *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 121 (3d Cir. 2000); citing 20 C.F.R. § 404.1545(a)) (other citation omitted). In this case, the ALJ found that Plaintiff has the RFC to perform the exertional demands of light work which does not expose him to hazards and involves simple, routine and repetitive work not requiring reading or math skills or more than two steps that is in a low stress work environment and does not involve strict production standards. Under the regulations, work is considered performed at the light level of exertion when it:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight may be very little, a job is in this category when it requires a

33

good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

After reviewing the record in this case, the Court finds it is unable to determine whether the ALJ's conclusion regarding Plaintiff's RFC is supported by substantial evidence.  The Court is handicapped in performing its review of the ALJ's decision by her failure to adequately evaluate all relevant evidence and to adequately explain the basis of her conclusions.  The Court of Appeals in *Fargnoli* provided the following framework for determining a claimant's RFC:

> The ALJ must consider all relevant evidence when determining an individual's residual functioning capacity in step four.  *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546; *Burnett,* 220 F.3d at 121.  That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others.  *See* 20 C.F.R. § 404.1545(a).  Moreover, the ALJ's finding of residual functioning capacity must "be accompanied by a clear and satisfactory explication of the basis on which it rests."  *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir. 1981).  In *Cotter,* we explained that "[i]n our view an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision.  This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. §405(g) to determine if the Secretary's decision is supported by substantial evidence."  *Id.* at 705 (quoting *Baerga v. Richardson,* 500 F.2d 309, 312 (3d Cir. 1974)).

*Fargnoli*, 247 F.3d at 41.

Here the ALJ relied primarily on the RFC assessments (physical and mental) completed by a non-treating, non-examining DDS physician and clinical psychologist (hereinafter "consultants")

34

in reaching the conclusion that Plaintiff can perform light work, specifically, his past relevant work as a crew person at McDonald's.[28]   The ALJ stated that she considered  these assessments in accordance with *Social Security Ruling 96-6p*[29] in determining whether Plaintiff was capable of performing any of his previous work.  (R. 19.) The ALJ found that the DDS consultants concluded that Plaintiff has the functional capacity to perform light exertional work which involves simple tasks.  (R. 19.)  The ALJ agreed with their conclusion because she found there was nothing in the record to contradict it.  (R. 19.)

The ALJ's conclusion is problematic for several reasons.  Although the ALJ stated that she considered the assessments in accordance with *Soc. Sec. Rul. 96-6p,* she completely ignores contradictory medical and non-medical evidence and fails to explain the weight given to the RFC assessments.  With regard to the ALJ's failure to discuss all of the relevant medical and non-medical evidence in this case, the Court notes that the ALJ seems to have selectively singled out those portions of the medical records that supported her decision, while failing to acknowledge those portions of the medical records that do not.  For example, although the ALJ discussed Dr. Smith's opinion, she discusses it only in relation to the November 6, 2001 office note which, as explained *supra,* was an insufficient basis for partially rejecting Dr. Smith's opinion.  Also, the ALJ discussed

---

28.  In assessing Plaintiff's RFC, the ALJ also considered Plaintiff's subjective complaints of fatigue and its effect on his ability to engage in substantial gainful activity.  The ALJ did not find Plaintiff's complaints fully credible, as more fully discussed in part 3, *infra.*

29.  *Social Security Ruling 96-6p* provides, in relevant part:
> RFC assessments by State . . . consultants . . . are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s). . . . they are to be evaluated considering all of the factors set out in the regulations for considering opinion evidence.

*Soc. Sec. Rul. 96-6p,* Jul. 2, 1996.

Dr. Jones' and Dr. Paxson's observations regarding Plaintiff's daily activities, but neglected their findings/opinions regarding Plaintiff's impairments and limitations therefrom. Moreover, the ALJ failed to make any mention of the medical records from the Mayo Clinic or the CERs from Greenville High School, both of which provide support for Plaintiff's subjective complaints. The ALJ also failed to mention the observation of the SSA representative who noted in the field office disability report dated September 30, 2002 that Plaintiff's right hand was unusable; appeared smaller in diameter than the left hand. (R. 68.) The ALJ also failed to note the medical findings of Doctors Poolos and Goral that supported Plaintiff's subjective complaints.

As the Court of Appeals found in *Fargnoli,* "the disparity between the actual record and the sparse synopsis of it" in the case at bar makes it impossible for this Court to review the ALJ's decision because the Court "'cannot tell if significant probative evidence was not credited or simply ignored.'" 247 F.3d at 42 (quoting *Burnett,* 220 F.3d at 121 (quoting *Cotter,* 642 F.2d at 705)). Although the ALJ is not expected to make reference to every relevant treatment note in a case that has voluminous medical records,[30] the ALJ, as the finder of fact, is required to consider and evaluate the medical evidence in the record in accordance with her responsibilities under the regulations and legal precedent. *Id.* The ALJ's failure to do so here requires the Court to remand for a more comprehensive analysis of the evidence in accordance with the applicable regulations and law as set forth in this report and recommendation.

Second, the ALJ failed to properly evaluate the RFC assessments of the DDS consultants. Because the RFC assessments by DDS consultants are to be treated as medical opinions from non-

---

30. The Court would not characterize the medical records in this case as voluminous, thus making the ALJ's failure to note relevant medical evidence even more egregious.

examining sources regarding an individual's capabilities despite his or her impairments, the ALJ is

required to  evaluate the assessments using the relevant factors for considering opinion evidence.

*Soc. Sec. Ruling 96-6p*; 20 C.F.R. § 404.1527(f)(2)(ii).  In any event, case law in this circuit clearly

holds that the opinions of a non-examining physician "'have less probative force as a general matter,

than they would have had if [the doctor] had treated or examined him.'" *Brewster v. Heckler,* 786

F.2d 581, 585 (3d Cir. 1986) (citing *Podedworny v. Harris,* 745 F.2d 210, 217 (3d Cir. 1984)) (other

citations omitted). Nonetheless, although not explicitly stated or explained, the ALJ appears to have

given controlling weight to the opinions of the consultants.

Third, the ALJ's agreement with the conclusion of the consultants regarding Plaintiff's RFC

was based on her finding that none of the other evidence in the record contradicted the assessments.

As noted earlier, however, the record contains substantial, unrebutted medical evidence which does,

indeed, conflict with the findings of the consultants, and therefore, calls into question the reliability

of the RFC assessments.  This unrebutted medical evidence indicates that Plaintiff has muscle

atrophy of the right arm and leg, flexion contracture of approximately 45 degrees in the right elbow,

right wrist and foot drop, a marked decrease in right hand grip (10 percent of predicted normal),

spasticity of moderate to moderately severe dysfunction of right upper extremity, spasticity and

flexor synergy of right upper extremity, and impaired gait due to right-sided weakness and right foot

drop.  It is also undisputed that Plaintiff suffers from congenital heart defect, stroke w/ resulting

physical and cognitive disfunction, mild mental retardation, and seizure disorder.  While the clinical

findings of Doctors Smith, Jones, Paxson, and Poolos do not explicitly include an opinion as to

Plaintiff's ability to perform work at the light level of exertion, at the very least the clinical findings

of these doctors are consistent with Plaintiff's subjective complaints, and show that: (1) Plaintiff's

37

gait is impaired due to right foot drop and right-sided weakness, thereby implying certain restrictions and/or limitations with walking and/or use of foot controls; (2) marked decrease in right hand grip resulting in substantial restrictions and/or limitations in the use of his right hand, in particular, fine manipulation; (3) Plaintiff's physical impairments have resulted in decreased stamina and easy fatigibility, thereby implying restrictions and/or limitations on Plaintiff's ability to keep pace, concentrate, and to engage in substantial gainful activity on a sustained basis.  In addition, the clinical findings of Dr. Goral include his opinion that given Plaintiff's physical and mental impairments, Plaintiff has major difficulties ranging from moderately limiting to severely limiting with regard to certain work related activities; and (2) a GAF score of 50, which indicates serious impairment in social, *occupational*, or school functioning.  The ALJ does not even acknowledge these contrary clinical findings, let alone provide an explanation for rejecting them.

The ALJ's failure to "mention any of these significant contradictory findings leav[es] this Court] to wonder whether [the ALJ] considered and rejected them, considered and discounted them, or failed to consider them at all.  'The ALJ's failure to explain [her] implicit rejection of this evidence or even to acknowledge its presence was error.'" *Fargnoli,* 247 F.3d at 43-44 (quoting *Cotter,* 642 F.2d at 707) (footnote omitted).  Historically, the Court of Appeals has indicated its concern with the decisions of ALJs that fail to properly consider, discuss and weigh relevant medical evidence.  *Id.* at 42 (citing *Dobrowolsky v. Califano,* 606 F.2d 403, 406-07 (3d Cir. 1979)).  Where conflicting, probative evidence exists in the record, the Court of Appeals has found there is a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and has vacated or remanded a case where such an explanation was absent.  *Id.* (citing *Cotter,* 642 F.2d at 706); *Burnett,* 220 F.3d at 121 (citing *Adorno,* 40 F.3d at 48).  Therefore, in light of the serious

38

deficiencies in the ALJ's evaluation of the evidence, the Court cannot conclude that the ALJ's findings at step four were supported by substantial evidence.

On remand, the ALJ should determine the weight to be given to the consultants conclusions and explain the bases therefore.  In so doing, the ALJ should, among other things, evaluate the consultants conclusions vis a vis the medical reports upon which they base their assessments.  For example, the RFC– Physical completed by Dr. Kar purports to rely on the report of Dr. Poolos.  In fact, Dr. Kar specifically notes the findings of Dr. Poolos regarding Plaintiff's right hemiplegia, and right wrist and foot drop and impaired gait.  Yet in his assessment, Dr. Kar finds *no* limitation with regard to walking, pushing or pulling (including operation of hand/foot controls), reaching, handling (gross manipulation), and feeling (fine manipulation), other than difficulty tying his shoes.  (R. 262, 264, 269-70.)  Dr. Kar's findings are clearly inconsistent with Dr. Poolos' report as well as the reports of Doctors Jones and Paxson and instead appear to be based on certain written statements made by Plaintiff [31] on October 29, 2002  in response to questions concerning any limitations he had with ADLs, stamina/energy levels, use of his hands, fatigue, pain, and seizure disorder.  (R. 95-104.)  However, Dr. Kar does not explain why he chose to credit some of Plaintiff's statements and not others. [32]  Therefore, the reliability of Dr. Kar's assessment is called into question.  *Brewster,* 786

---

31.  Some of these written statements appear to have been made on Plaintiff's behalf by his father, Dr. Carl Meyer.  (R. 103-04.)

32.  Dr. Kar gave credit to Plaintiff's statements that he does not have any problems with personal care; he drives 50-100 miles per week; does shopping; is able to load and unload grocery bags and carry 3-4 at a time; enjoys being a cub scout leader; has no problems with walking, sitting, or climbing stairs many times; can lift 50-80 pounds; has no problem with the use of his hands except tying his shoes is difficult. (R. 270.)  However, Dr. Kar's characterization of Plaintiff's statements is not entirely accurate as it ignores other statements by Plaintiff wherein he noted limitations with many of the same activities.  For example, Plaintiff also indicated that if he does more than usual on a particular day, he has a problem with fatigue and coordination due to loss of use of his right arm and hand, and his legs easily get tired causing him to stumble a lot, as a result of the stroke.  (R. 95.)   Plaintiff further indicated that he required assistance with the laundry, cooking and cleaning  if he works full-time.  (R. 95-97.)  At the hearing on December 9, 2003, Plaintiff testified that when doing yard work or engaging in any physical activity, he requires

F.2d at 585.  At the very least, the ALJ should note the inconsistencies and address them in her decision.

Similarly, the RFC–Psychological completed by Dr. Golin purportedly gives great weight to the report of Dr. Goral.  (R. 273.)  Dr. Golin notes Plaintiff's borderline intellectual functioning and states "he has no other mental limitations" despite Dr. Goral's opinion that Plaintiff has a GAF score of 50 and has math and reading disorders, rendering him functionally illiterate and incapable of managing his own financial affairs.  Although generally the Court would assume the consultant took this into consideration if he states he gave great weight to the physician's report,  Dr. Golin, by stating Plaintiff has no other mental limitations, negates that assumption.  Therefore, it is unclear what, if any, consideration Dr. Golin gave to Plaintiff's GAF score and reading and math disorders in completing the assessment.  In addition, Dr. Golin's assessment for sustained concentration and persistence appears to be somewhat inconsistent with other evidence in the record.  For example, Dr. Golin rates Plaintiff's ability to maintain attention and concentration for extended periods of time as not significantly limited.  (R. 271.)  Yet, the Greenville Area High School Special Education Comprehensive Evaluation Report ("CER") dated April 2, 1998 for tenth grade notes "[h]istorically, [Plaintiff] has difficulties with concentration and attention.  (R. 128.)  The CER dated April 15, 1996 for eighth grade indicates "[Plaintiff] has had longstanding difficulties with attention and concentration.  He currently takes Ritalin to address attentional concerns."  (R.  130.)  These inconsistencies raise a question as to the reliability of Dr. Golin's assessment.  At the very least, the

---

periodic breaks to rest and catch his breath.  (R. 328-30.)  He also testified that when he gets home from work, he usually takes a nap.  (R. 329.)  The difficulties and/or limitations with ADLs that Plaintiff claims due to fatigue and loss of coordination are supported  by his medical diagnoses and physical impairments.  Although Dr. Kar did not have the benefit of Plaintiff's testimony before the ALJ, the ALJ certainly was aware of Plaintiff's testimony yet she failed to note any of the differences between Dr. Kar's findings as to Plaintiff's limitations and the other evidence in the record as to Plaintiff's complaints regarding his limitations.

ALJ should note the inconsistencies and address them in her decision.

On remand, the ALJ should provide an explanation of the weight given to the consultants conclusions in light of all the relevant medical and non-medical evidence in the record.

### 3.     Plaintiff's Credibility As To His Subjective Complaints

In reaching the conclusion that Plaintiff was capable of performing his previous relevant work at McDonalds, the ALJ considered Plaintiff's complaints and limitations and found Plaintiff not to be fully credible.   Plaintiff submits that the explanation given by the ALJ for rejecting Plaintiff's testimony regarding his limitations was inadequate.  For the reasons set forth below, the Court agrees with Plaintiff.

In making a determination of a claimant's residual functional capacity, the ALJ is required to consider a claimant's subjective complaints and the extent to which those complaints can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record.  *Schwartz v. Halter,* 134 F.Supp.2d 640, 653 (E.D.Pa. 2001) (citing 20 C.F.R. §§ 404.1529(a), 416.929(a)).  The ALJ is obligated to seriously consider subjective complaints of pain or other symptoms,[33] even where those complaints are not supported by objective evidence.  *Id.* (citing *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir. 1985))).  Although objective evidence of pain or other symptoms is not required, objective medical evidence must show the claimant has a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms.  *Schwartz,* 134 F.Supp.2d at 653 (citing *Green v. Schweiker,* 749 F.2d 1066, 1070-71 (3d Cir. 1984)); *Ferguson v. Schweiker,* 765

---

33.  Subjective complaints are not limited to pain, but may also include other symptoms, such as fatigue, shortness of breath, weakness or nervousness.  20 C.F.R. §§ 404.1529(b), 416.929(b).

F.2d 31, 37 (3d Cir. 1985) (citation omitted). If medical evidence exists that supports a claimant's complaints of pain or other symptoms, the complaints are entitled to great weight and may not be disregarded unless contrary medical evidence exists. *Schwartz,* 134 F.Supp.2d at 653-54 (citing *Mason,* 994 F.2d at 1067-68 (citing *Carter v. R.R. Ret. Bd.,* 834 F.2d 62, 65 (3d Cir. 1987); *Ferguson,* 765 F.2d at 37)). In addition, when a claimant's subjective testimony of his inability to perform even light or sedentary work is supported by competent medical evidence, the ALJ is required to give great weight to the claimant's testimony. *Id.* at 654 (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 433 (3d Cir. 1999)) (other citation omitted).

The regulations set forth a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, and the extent to which the claimant's symptoms affect his ability to do basic work activities. First, the ALJ must consider whether there is objective medical evidence in the record of a physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Social Security Ruling 96-7p,* July 2, 1996. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, then the ALJ must evaluate the intensity, persistence, and limiting effects of these symptoms on a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1529(c), 416.929(c); *SSR 96-7p.* If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairments could not be reasonable expected to product the claimant's symptoms, then the symptoms cannot be found to affect the claimant's ability to do basic work activities. *SSR 96-7p.*

In evaluating the intensity and persistence of a claimant's symptoms, the ALJ must "consider

42

all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements from [the claimant], his treating or examining physician or psychologist, or other persons about how [the] symptoms affect [the claimant], . . . and the medical opinions of [the claimant's] treating source and other medical opinions."   20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).   The ALJ must also consider and weigh all of the non-medical evidence such as information about the claimant's prior work record, observations by SSA employees and other persons, and in this case, the CER reports/records from Greenville High School.   20 C.F.R. §§  404.1529(c)(3), 416.929(c)(3); *Burnett,* 220 F.3d at 122 (citations omitted).   Finally, the ALJ will take into consideration factors relevant to the claimant's pain or other symptoms, such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the  symptoms; (5) treatment, other than medication, received for relief of the symptoms; (6) measures used to relieve the symptoms; (7) other factors relating to the claimant's functional limitations and restrictions due to the symptoms.  *Id.*

In addition, *Social Security Ruling 96-7p* requires the ALJ to articulate the reasons for her credibility findings.  In particular, *SSR 96-7p* provides:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

43

*SSR 96-7p; see also Fargnoli,* 247 F.3d at 41 (citations omitted) (in determining claimant's RFC, ALJ must review all relevant medical and non-medical evidence and explain his conciliations and rejections); *Burnett,* 220 F.3d at 121-22 (citations omitted) (same).

There does not appear to be any dispute that the record contains unrebutted, objective medical evidence of physical and mental impairments that could reasonably be expected to produce fatigue, shortness of breath, and difficulties with keeping pace/concentration. This evidence consists of the following diagnosed physical and mental impairments: Congenital heart defect, stroke causing right hemaparesis and cognitive dysfunction, mild mental retardation, and seizure disorder. The medical reports and records of Plaintiff's treating physicians from the Mayo Clinic, Dr. Smith and Dr. Jones, as well as the medical reports of Dr. Poolos and Dr. Goral, further show that Plaintiff's congenital heart defect, stroke and seizure disorder could reasonably be expected to produce fatigue, shortness of breath, right-sided weakness, and difficulties with concentration and keeping pace for extended periods of time. In addition, the CERs support Plaintiff's complaint of difficulties with attention and concentration.

Thus, the Court turns to whether the ALJ's evaluation of the intensity, persistence, and limiting effects of Plaintiff's symptoms on his ability to engage in substantial gainful activity is supported by substantial evidence. In making the credibility determination, the ALJ's proffered explanation focuses on certain statements made by Plaintiff which, when considered in isolation, do not provide an accurate picture of Plaintiff's ability to engage in substantial gainful activity. Had the ALJ considered all of Plaintiff's statements, including the testimony at the hearing, and attempted to reconcile it with the entire record, and then concluded that Plaintiff's complaints did not preclude him from engaging in SGA at the light level of exertion, that decision may have been found to be

44

supported by substantial evidence.  However, the ALJ's evaluation falls short of that mark.

In particular, the ALJ gave the following explanation for finding Plaintiff's complaints not fully credible:

> The claimant testified that he has been unable to work full-time because he tires easily.  However, the undersigned notes that the claimant is referring to muscle tiredness as he testified that if he stops what he is doing for a minute or so, he is able to resume the activity. He said that he never naps; and he engages in significant activities including basketball and running.  He also does mechanical work on cars and yard work.  His social activities are normal, he has a girlfriend and intended to be married in July 2004 and his mental functioning (sic) limited only by general overall decreased intellect. He also testified that he hopes to continue his education with attendance at a school for juvenile justice.
>
> Accordingly, the undersigned Administrative Law Judge finds that the claimant has had the residual functional capacity to perform the exertional demands of light work which does not expose him to hazards and involves simple, routine and repetitive work not requiring reading or math skills or more than 2 steps that is in a low stress work environment . . . and does not involve strict production standards.  This finding is consistent with the objective medical evidence, including findings on clinical examinations.  It is also consistent with claimant's activity level as indicated.  The objective medical evidence does not support a finding that the claimant is more severely limited than stated above.  In addition, the undersigned notes that the claimants' current work activity as a stock clerk at Giant Eagle is limited by his employer's policy of not hiring full-time help (except for managers and office staff), rather than limitations cause (sic) by his impairments.

R. 19-20.  As more fully explained below, the ALJ's explanation does not comport with the requirements of *SSR 96-7p* or the case law of the Third Circuit.

First, the ALJ's finding that Plaintiff's fatigue is nothing more than "muscle tiredness" is not supported by any medical evidence.  The ALJ impermissibly substituted her judgment for that of the physicians, without any medical evidence to support it.  *Dombroski,* 1998 WL 372551, at * 3.

Second, the ALJ's reliance on Plaintiff's daily activities to discredit his allegations of limitations is misplaced.  The ALJ mischaracterizes Plaintiff's statements regarding his non-work activities in several respects.  First, the ALJ fails to note that the record contains two statements from Plaintiff regarding naps, which are inconsistent.[34]  For example, on the Daily Activity Questionnaire dated November 5, 2003, in response to the question "do you take any naps during the day", the type-written response stated "I do not nap during the day." (R. 115.)  However, at the hearing on December 9, 2003, Plaintiff stated that he naps all the time when he gets home from work.  (R. 329.)

In addition, the ALJ fails to consider evidence in the record (in the form of written statements and testimony from Plaintiff) that do not support her conclusion that Plaintiff engages in significant activities including running and basketball.  At the hearing, the ALJ questioned Plaintiff regarding a notation in the record that he used to play basketball.  (R. 324.)  Plaintiff responded that he "didn't get off the bench."  The last time he played basketball was a month ago, but that was the last time.  He had a lot of difficulty; he could only play for 15 minutes and then he had to stop.  (R. 338.)  He denied playing any other sports.  (R. 324.)   The only reference to running in the record is in the hearing testimony, where the ALJ is questioning Plaintiff regarding what activities at work make him tired.[35]  (R. 328) Plaintiff testified that he gets tired at work from lifting, walking fast, or running long distance.  (R. 328).  He also testified he gets short of breath from running and walking.  (R. 330.)  When he gets tired from these activities, Plaintiff must stop what he is doing, and sit down

34.  There are several explanations for the inconsistencies in Plaintiff's statements–his borderline intellectual functioning and retention problems; the format and context of the question; and fact that Plaintiff's father completed some of the questions on Plaintiff's behalf.  None of these explanations casts doubt on Plaintiff's credibility. *Dombroski*, 1998 WL 372551, at *4-5 (noting individual with mental impairment may have difficulty remembering and recounting his symptoms and history, and may deny he has a problem or need to seek help).

35.  There is simply no evidence in the record that Plaintiff regularly engages in running.  Indeed, the record suggests otherwise since his gait is impaired and running, as well as walking, cause him shortness of breath.

46

for five minutes, before resuming his work. (R. 328-29.) With regard to walking, Plaintiff testified he cannot walk in a straight line, but could walk as far as around the perimeter of a football field one time, but he would be tired after doing it. He can only walk at a regular pace for about a half hour and then he gets fatigued. (R. 338.) As to doing yard work at his parents' house, Plaintiff testified that although he is able to mow the grass, trim shrubs, etc., he takes 10 minute breaks, and he gets short of breath. (R. 329.)

Moreover, Plaintiff's ability to do mechanical work on cars does not support a finding of not disabled. The mere fact that Plaintiff likes to "work" on cars, without any evidence as to the frequency, duration, or whether this activity was done after a full or work or on the weekends, does not negate disability. *Cf. Brophy v. Halter,* 153 F.Supp.2d 667, 671 (E.D.Pa. 2001) (substantial evidence supported ALJ's conclusion that claimant was working on hs automobiles for four to six hours at a time with some frequency and therefore such activity was not sporadic and could be considered as inconsistent with disability). Unlike the evidence in *Brophy*, the record here does not support an inference that Plaintiff's work on cars was not sporadic and therefore inconsistent with disability. Mere involvement in a few social activities is not sufficient to support a finding that Plaintiff's complaints are not fully credible. *Smith,* 637 F.2d at 971-72.

"[S]poradic or transitory activity does not disprove disability" and having a disability does not require that claimant "vegetate in a dark room." *Id.*; *see also Thompson v. Barnhart*, 281 F.Supp.2d 770, 781 n. 7 (E.D.Pa. 2003) (citing *Smith*, *supra*) (observing that law does not require a complete restriction from recreational and other activities as a prerequisite to a finding of disability); *Reider,* 115 F.Supp.2d at 504 (same). That Plaintiff can watch television, do some laundry, cooking and cleaning, do some yard work with rest periods, drive a car with modifications

for foot and hand controls, occasionally work on his car, and attend a weekly cub scout meeting does not mean that his complaints of fatigue, shortness of breath, and difficulty keeping pace are not credible.  These activities do not require walking long distances, running, meeting production standards or engaging in sustained physical activity without breaks.  Moreover, there is no evidence in the record as to the frequency and duration of these activities.

Third, the ALJ's finding that Plaintiff's mental functioning is limited only by a general overall decreased intellect oversimplifies Plaintiff's mental impairment and is not supported by the medical evidence.  For example, Dr. Goral opined that although Plaintiff showed excellent assets in his social-interactive skills and his love of being with people,  his long-term placement in special education and his difficulties with learning disorders show that he is impaired with job tasks that are any larger than simplistic, and therefore, Plaintiff's overall prognosis  is guarded.  In addition, the ALJ neglects to mention that Plaintiff's hope of continuing his education is somewhat attenuated given his substantial learning disabilities.  The Office of Vocational Rehabilitation has required Plaintiff to be tutored in reading and math and he must attain certain proficiency levels before he can even begin to think about applying to a post-secondary school program.  (R. 347.)

Finally, it does not appear that the ALJ took into consideration that Plaintiff's past attempts to engage in substantial gainful activity were unsuccessful.  With regard to the nursing home job, Plaintiff testified that although he worked eight hours a day, he had trouble with concentration, fatigue and endurance, and that was part of the reason he was fired–he did not meet the employer's standards for keeping pace. (R. 333-34.) He believes he was fired from Colonial because he needed

two hands and he could not do the work; this prevented him from getting a nurses' aid license.[36]  (R. 318.)  With regard to the crew position at McDonalds,[37] Plaintiff testified that after several months, he was too fatigued to work there in addition to working at Giant Eagle.  Although he was able to work both jobs for a period of time, Plaintiff stated on his disability claim dated September 30, 2002 that he became too fatigued from working both jobs and had to quit the job at McDonalds. (R. 71.)  The SSA representative noted on the Work Activity Report dated September 30, 2002 that "[Plaintiff] had to quit one of his jobs due to his impairment.  He is now working below SGA level.  Estimated wages $600.00.  Last year 2001–average $550.00."[38]  (R. 86.)  Also, in response to the question: "what activities have you had to stop" contained in the disability claim, Plaintiff responded that he tried to work two jobs, but could not do this.  (R. 97.)  This evidence appears to be uncontradicted.

In her decision, the ALJ failed to mention this evidence regarding Plaintiff's past relevant work.  Therefore, the Court is unable to determine if the ALJ considered and rejected it, or even considered it at all.  Because this evidence supports Plaintiff's subjective complaints, on remand the ALJ must weigh this evidence and provide an explanation for her treatment of it.

---

36.  The reference to Colonial appears to refer to a different nursing home job that he held while in high school.  The post-high school nursing home position was with White Cliff.  (R. 87, 118.)

37.  In the Work History Report dated October 29, 2002, Plaintiff described the crew person job as involving the cleaning and maintenance of cooking equipment.  (R. 89.)  The record contains no other information regarding this position except for exertional requirements (*e.g.,* walking, standing, lifting, carrying, and stooping).  (*Id.*)

38.  Soc.Sec.Rul. 96-8p states in pertinent part:
> Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must included a discussion of the individual's abilities on that basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Soc.Sec.Rul. 96-8p (footnote omitted) (emphasis in original).  Plaintiff's previous work at McDonald's was performed on a part-time basis, as is his current work as a stock clerk with Giant Eagle

With regard to his part-time stock position at Giant Eagle, Plaintiff testified that if he works for six hours, he has problems with concentration and fatigue. (R. 334, 336-37.) He must take two to three unscheduled breaks in addition to his regular break in a four to five hour period. If he was working eight hours, he would need to take four to six unscheduled breaks in addition to his regular breaks. (R. 335.) Plaintiff also stated in his disability claim that he left his job cleaning and maintaining cooking equipment at McDonald's because he was too fatigued to work there in addition to working at Giant Eagle. (R. 71, 86.) Despite this uncontradicted evidence from Plaintiff, which the ALJ does not discuss anywhere in her decision, the ALJ noted simply that Plaintiff's current part-time job at Giant Eagle is limited by the employer's policy of not hiring full-time help for Plaintiff's position, rather than any limitations caused by his impairments. The fact that an employer does not have full-time work or that a claimant is willing to work more hours does not prove, however, that Plaintiff is not disabled. Rather, the proper inquiry is whether given all of Plaintiff's physical and mental impairments he is capable of engaging in substantial gainful activity.

Given the ALJ's failure to evaluate Plaintiff's complaints in light of all the relevant medical and non-medical evidence and to explain her conciliations, the Court concludes that the ALJ's finding at step four is not supported by substantial evidence. Therefore, this case must be remanded for further consideration in light of this report and recommendation.

### 4.    ALJ's Determination of Plaintiff's Past Relevant Work

The ALJ's determination at step four is not supported by substantial evidence for another reason. The ALJ has failed to make the required findings of fact in determining whether Plaintiff has the residual functional capacity to perform his past relevant work.

In determining whether a claimant has the residual functional capacity to perform his or her

past relevant work, the ALJ's decision must contain the following specific findings of fact:

> (1)    A finding of fact as to Plaintiff's residual functional capacity in light of all his established physical and mental impairments;[39]
>
> (2)    A finding of fact as to the physical and mental demands of the claimant's past relevant work/occupation; and,
>
> (3)    A finding of fact that the claimant's residual functional capacity would allow him to return to his past relevant work or occupation.[40]

*Soc. Sec. Ruling 82-62,* 1982 WL 31386 at *4; *see also Burnett,* 220 F.3d at 123 (citing *SSR 82-62*).

The ALJ has not made any findings of fact regarding the physical and mental demands of Plaintiff's past relevant work.  Inexplicably, the ALJ did not attempt to gather any information from Plaintiff at the hearing about his past work at McDonalds, his hours, job duties, difficulties, performance, or special  accommodations made,[41] yet she determined that he has the RFC to return to that job.[42]

Moreover, the documentation in the record is entirely insufficient to make such a determination in the first instance.  Since this case must be remanded for further consideration on the ALJ's other findings, the ALJ should also develop the vocational documentation and make the required findings of fact regarding Plaintiff's past relevant work.  In making these findings of fact,

---

39.  As discussed above, the ALJ's analysis and findings as to this factual issue were insufficient and should be more fully developed on remand.

40.  This finding of fact results from a comparison of the first two findings of fact.  The ALJ's explanation of this finding of fact must include a description of the weight attributed to the pertinent medical and non-medical factors in the case and reconcile any significant inconsistencies.  The ALJ may draw reasonable inferences but may not use presumptions, speculations and suppositions.  *Soc. Sec. Ruling 82-62,* at *4.

41.  There is some testimony in the record that suggests Plaintiff cannot perform all of the duties of the crew job at McDonald's or the stock clerk job at Giant Eagle yet he was working as a stock clerk at the time of the hearing (R. 341), leading the Court to believe that some accommodation is being made to his stock clerk duties for his impairments.  The ALJ should explore this on remand.

42.  The only testimony gathered at the hearing regarding the crew position at McDonald's was from the VE but only as to the exertional level, which the VE described as  light and unskilled.  (R. 340.)

the SSA provides guidance as to the sources that should be considered:

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work.   Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reasons(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy. . . . every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

*Soc. Sec. Ruling 82-62,* at *3.

The case at bar presents a situation where the Plaintiff's statements do not provide sufficient information regarding the physical and mental demands of his past relevant work to permit a decision as to his ability to return to such past work.[43]   Therefore, supplementary information from his employers or other sources should be obtained.   The SSA has provided the following guidance as to what the documentation should consist of:

> Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations.   Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source.   Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the

---

43.  The vocational documentation from Plaintiff is sparse, consisting only of the Work Activity Report completed with his disability claim, which fails to sufficiently describe his job responsibilities, especially those duties that would be impacted by his mental impairment.  *See also* note 37, *supra*.

> extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and current relevance of the individual's work experience.  In addition, for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tensions and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance fo such work.  Persons with physical impairments (e.g., cardiovascular or gastrointestinal disorders) may have performed stressful tasks. This may also require a decision as to whether the impairment is compatible with the performance of such work.  If more than one job was performed during the 15-year period, separate descriptions of each job will be secured.

*Id.* at *3.

Because the vocational documentation from Plaintiff is insufficient, and given Plaintiff's mental impairment, the ALJ should, on remand, obtain the required vocational documentation from Plaintiff's employers and/or any other informed source.  Once the vocational documentation is obtained, the ALJ should make specific findings of fact as to the physical and mental demands of Plaintiff's past relevant work and as to Plaintiff's ability to perform that work in light of his physical and mental impairments.[44]  *Burnett,* 220 F.3d at 125-56 (citing *SSR 82-62*) (footnote omitted).

III. **Conclusion**

For the reasons set forth above, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (Docket No. 8) be denied at to his request for an award of disability insurance

---

44. Given the Court's conclusion regarding the ALJ's step four analysis, the Court does not reach the ALJ's alternative finding at step five.  On remand, however, should the ALJ find it necessary to proceed to step five, she should conduct that analysis anew after full development and reconsideration of the evidence as set forth above.

benefits and supplemental security income, but granted as to his alternate request for remand, that Defendant's Motion for Summary Judgment (Docket No. 10) be denied, and that the decision of the Commissioner of Social Security ("Commissioner") denying an award of disability insurance benefits and supplemental security income be vacated and remanded for further proceedings consistent with this report and recommendation.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


Dated: March 20, 2006                    /s/Lisa Pupo Lenihan
                                        LISA PUPO LENIHAN
                                        United States Magistrate Judge


cc:     Honorable Gary Lancaster
        United States District Judge

        Terry K. Wheeler, Esquire
        56 Clinton Street
        Greenville, PA 16125

        Lee Karl, Esquire
        United States Attorney's Office
        700 Grant Street
        Suite 4000
        Pittsburgh, PA 15219


55